**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

LOUIS WATLEY,                         :
                                      :    Civil Action No. 09-4358 (SRC)
                 Petitioner,          :
                                      :
            v.                        :    **OPINION**
                                      :
DONALD MEE, Administrator,            :
et al.,                               :
                                      :
                 Respondents.         :


**APPEARANCES:**

Petitioner pro se                    Counsel for Respondents
Louis Watley                         Sara Beth Liebman
East Jersey State Prison             Union County Prosecutor Ofc.
1100 Woodbridge Rd.                  32 Rahway Avenue
Lock Bag R                           Elizabeth, NJ 07202
Rahway, NJ 07065


**CHESLER,** District Judge

Petitioner Louis Watley, a prisoner currently confined at East Jersey State Prison in Rahway, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondents are Administrator Donald Mee and the Attorney General of the State of New Jersey.

For the reasons stated herein, the Petition must be denied.

## I.   BACKGROUND

### A.   Factual Background

The relevant facts are set forth in the opinions of the Superior Court of New Jersey, Appellate Division.[1]

> The victim, eighteen year old N.R., testified that she was working in defendant's office in Irvington on Sunday, April 13, 1997, when defendant grabbed her, pulled her, "started to rub [her] breast" and "butt," took her jean shirt and tee shirt off, "unsnapped [her] overalls buckles," pulled down her pants and underpants, and pushed her to the floor onto her back. Defendant then removed his pants and underpants, kissed her, and forcibly "put his penis in [her] vagina," even though she was menstruating that day.
>
> According to the victim, defendant then told her he had to "get some kind of paperwork" from his home, "grabbed" her wrist, and pulled her to his car.  She neither said anything nor yelled out because she was "afraid."
>
> At defendant's house, in Linden, defendant pulled her to a bedroom where he kissed her, threw her on the bed, removed her clothes, performed sexual acts and then penetrated her vagina with his tongue and penis. N.R. thereafter returned to the office, and because "on the way back ... [defendant] told [her] that he would kill me" if she told anyone of the attack, she remained silent.  Defendant had further sexual contact with her in the office that day, and again threatened to "kill" her if she told anybody.  Even though she was upset and crying when she arrived home that evening, she did not tell anyone "[b]ecause [she] was scared," and did not want to report the event in light of her "culture and

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

religion," as she would be considered a "bad person" and would "bring dishonor to [her] family."

According to N.R., further sexual contact occurred at work on subsequent days, and she was again threatened and warned not to tell about it.

N.R. was crying when she returned home from work on April 19, 1997, after "[running] out" when told that defendant and she were going back to his house "to have some fun." Later that day, she ultimately told her mother about the attacks and reported the incidents to the Irvington and Linden Police Departments.

(Opinion, Superior Court of New Jersey, Appellate Division, at 5-7 (April 23, 2004).)

After the crime was reported, defendant's house was searched. A stained bed sheet was seized. Controlled samples of defendant's and the victim's blood and saliva were taken, and DNA extracted from the stain on the bed sheet was tested. The results confirmed that the stain contained defendant's DNA and the DNA of another person. The testing did not permit either the defense expert or the State's expert to conclusively identify or rule out the victim as the person who contributed the unidentified DNA extracted from the stain.

At trial, defense counsel and the prosecutor agreed to stipulate to the chain of custody for the bed sheet and the controlled samples of blood and saliva that were taken from defendant and the victim. They also stipulated that: semen and blood were detected on the bed sheet; no semen was detected in the victim's underwear; and defendant's blood type is "B" and the victim's is "A." The stipulation did not identify the type of the blood found on the bed sheet, and no evidence about the type of the blood that was found on the sheet was introduced at trial. Although the scientific evidence of identity based on the stained sheet was limited to the DNA evidence, the detective who retrieved the sheet from defendant's bed testified that the stain appeared to be dried blood, and the victim was shown a photograph of the bed sheet, which she described as showing her blood on the sheet.

(Opinion, Superior Court of New Jersey, Appellate Division, at 2-
(December 17, 2008).)

B.    Procedural History

Tried to a jury in the Superior Court of New Jersey, Law
Division, Union County, Petitioner was convicted of first-degree
aggravated sexual assault in Linden, N.J.S.A. 2C:14-2a(3) (count
four), second-degree kidnapping, N.J.S.A. 2C:13-1b (count three),
third-degree terroristic threats, N.J.S.A. 2C:12-3b (count five),
and fourth-degree sexual contact in Irvington, N.J.S.A. 2C:14-3b
(count one).  Petitioner was sentenced to an aggregate term of
eighteen years' imprisonment.

On April 23, 2004, the Superior Court of New Jersey,
Appellate Division, affirmed the conviction and sentence.  The
Supreme Court of New Jersey denied certification on June 29,
2004.

Petitioner timely filed a motion for post-conviction relief
asserting, among other things, a claim for ineffective assistance
of trial counsel.  Following a non-evidentiary hearing on June
17, 2005, the trial court denied relief on June 22, 2005.  On
April 5, 2007, the Appellate Division affirmed in part the denial
of relief, but remanded in part for an evidentiary hearing on
Petitioner's claim of ineffectiveness with respect to his trial
counsel's treatment of the blood evidence produced at trial,
including the stipulation the judge read to the jury.

4

On July 24, 2007, the trial court conducted an evidentiary hearing with respect to the remanded claim.  Prior to the hearing, the trial court permitted both Petitioner and the state to submit supplemental memoranda.  At the hearing, the court heard from two witnesses: Petitioner's trial counsel Cassandra Savoy, Esquire, and Dr. Robert Shaler.  After the hearing, the PCR court allowed both Petitioner and the state to submit written summations as to what they believed the evidence did or did not show as a result of the testimony taken.  On September 28, 2007, the PCR court issued a written opinion expressing its reasons for denying relief in an order entered October 2, 2007.  On December 17, 2008, the Appellate Division affirmed the denial of relief. On May 18, 2009, the Supreme Court of New Jersey denied certification.

This Petition followed.  Here, Petitioner asserts the following claims for relief: (1) ineffective assistance of trial counsel based on the failure to object to the blood and DNA evidence introduced at trial, and failure to call defense psychiatrist Dr. Latimer, who could allegedly testify that the victim's statements were false, and (2) prosecutorial misconduct based on the introduction of allegedly fabricated blood and DNA evidence, and remarks in opening and closing statements regarding blood evidence.

Respondents have answered and Petitioner has filed a Reply in support of the Petition.  This matter is now ready for determination on the merits.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless

6

arrives at a result different from [the Court's] precedent."
Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J.,
for the Court, Part II).  A state court decision "involve[s] an
unreasonable application" of federal law "if the state court
identifies the correct governing legal rule from [the Supreme]
Court's cases but unreasonably applies it to the facts of the
particular state prisoner's case," and may involve an
"unreasonable application" of federal law "if the state court
either unreasonably extends a legal principle from [the Supreme
Court's] precedent to a new context where it should not apply or
unreasonably refuses to extend that principle to a new context
where it should apply," (although the Supreme Court expressly
declined to decide the latter).  Id. at 407-09.  To be an
"unreasonable application" of clearly established federal law,
the state court's application must be objectively unreasonable.
Id. at 409.  In determining whether the state court's application
of Supreme Court precedent was objectively unreasonable, a habeas
court may consider the decisions of inferior federal courts.
Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits
of a claim is entitled to § 2254(d) deference.  Chadwick v.
Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v.
Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims
presented to, but unadjudicated by, the state courts, however, a

7

federal court may exercise pre-AEDPA independent judgment.  <u>See</u> <u>Hameen v. State of Delaware</u>, 212 F.3d 226, 248 (3d Cir. 2000), <u>cert. denied</u>, 532 U.S. 924 (2001); <u>Purnell v. Hendricks</u>, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).  <u>See also</u> <u>Schoenberger v. Russell</u>, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." <u>Priester</u> <u>v. Vaughn</u>, 382 F.3d 394, 398 (3d Cir. 2004) (citing <u>Early v.</u> <u>Packer</u>, 537 U.S. 3 (2002); <u>Woodford v. Visciotti</u>, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  <u>See</u> 28 U.S.C. § 2254(b)(2); <u>Lambert v.</u> <u>Blackwell</u>, 387 F.3d 210, 260 n.42 (3d Cir. 2004); <u>Lewis v.</u> <u>Pinchak</u>, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  <u>Estelle</u> <u>v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting

submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

### III.  ANALYSIS

A.   Ineffective Assistance of Counsel Claim

As noted above, Petitioner contends that his trial counsel failed to provide constitutionally adequate representation with respect to the blood and DNA evidence introduced at trial, and for her disagreement regarding calling defense witness psychiatrist Dr. Latimer, who testified that the victim's statements were false.

The state courts considered and rejected Petitioner's ineffective assistance of counsel claims, speaking specifically only to the claims regarding blood and DNA evidence, and rejecting all other claims as being without sufficient merit to warrant discussion in a written opinion.

> The additional testimony included the following: On April 18, 1997, N.R., her sister, T.R., and brother, M.R., went to the Linden Police Station and met with Detective (Det.) Evans, who took photographs, interviewed N.R. and went to N.R.'s home where he obtained the clothes N.R. was wearing on April 13, 1997.  Those clothes included panties, denim jeans, and two shirts.  The panties had blood stains and were submitted to the Union County laboratory for analysis. N.R. showed Evans an abrasion on her hand and a few days later the place on her neck and back where marks, which were no longer visible, had been inflicted.

9

On April 21, 1997, Det. Evans gained entrance to defendant's house pursuant to a court order and photographed and seized a bed sheet and clothing. Evans testified to two photographs, which he indicated depicted "some discolorations, possible stains [on defendant's bed] sheet."  When asked to describe what the stains looked like, Evans stated, "[i]t's a discoloration similar to that of dried blood."

On April 30, 1997, N.R. met with Dr. Linda Shaw, a pediatrician and medical expert in the field of abuse, who conducted a gynecological examination of N.R., which showed no signs of infection, injury or healing areas.  Dr. Shaw testified she did not expect to have medical findings seventeen days post assault because the vaginal mucous membranes heal quickly, nor would she expect N.R. to be complaining of pelvic discomfort two and a half weeks after forcible rape.  Dr. Shaw opined that the fact that the hymenal ring was not disrupted was not inconsistent with forcible rape because the ring is expansible.

Dr. Richard Bodner, an expert in gynecology, testified for defendant that based on Dr. Shaw's medical report that indicated N.R.'s hymen was intact and showed no signs of abrasions or lacerations, and because N.R. felt no pelvic discomfort, it was his opinion N.R. was not the victim of a forced penetration.

Dr. Christine Baker, a clinical psychologist, testified about post-traumatic stress disorder (PTSD) and major depressive disorder and how these recognized diagnoses affect persons suffering from a traumatic event.  While giving testimony outside the jury's presence, Dr. Baker initially testified that when N.R. was asked if she was raped, she spoke of more than one incident and when she and N.R. spoke of penetration, N.R. reported only one occasion.  After being asked to review her report to refresh her recollection, she testified that N.R. disclosed one act of penetration in Irvington and one in Linden.  On cross-examination, Dr. Baker clarified that N.R. told her she was fondled, touched and kissed in Irvington.

In order not to inconvenience her, Dr. Baker was asked to give rebuttal testimony outside the presence of the jury for potential use if the defense

psychiatrist testified and rebuttal was warranted.  In
her rebuttal testimony, Dr. Baker testified that N.R.
told her she was assaulted both in Irvington and Linden
on April 13, 1997, but was penetrated once.

The defense psychiatric expert, Dr. Richard
Latimer, testified that N.R. told him, when asked
"three times," that she was penetrated only once.
However, Dr. Latimer testified that N.R. informed him
that she was "confused" when she told him previously
that she had been "raped" only once when asked about a
sexual assault in defendant's office.  Dr. Baker was
never recalled before the jury and her rebuttal
testimony was not read to the jury.

Mr. Joseph LaRue, a principal forensic scientist
with the New Jersey State Police, was the State's
expert in DNA analysis profiling.  After completing the
DNA profiles of both N.R. and defendant, LaRue
extracted samples of the bed sheet and was able to
retrieve and determine the DNA of defendant.  He could
not exclude or confirm N.R. as a contributor.
Defendant's DNA was not found on N.R.'s panties.

Dr. Robert Shaler was qualified as the defendant's
DNA expert.  Dr. Shaler acknowledged that defendant's
DNA was on the stain on the bed sheet but testified
that while N.R. could not be excluded as a contributor
to the stain, 215 other profiles were possible.

...

In the prosecutor's opening statement, she made
the following proffer to the jury.

You're going to hear testimony from the
police officer who investigated the case, who
photographed the evidence, who collected the
evidence.  You're going to hear testimony, ladies
and gentlemen, that evidence was seized from
[L.W.'s] residence.  That evidence consisted of,
among other things, a stained bed sheet stained
with blood and semen.  You're going to hear that
in fact [N.R.] was menstruating during the time of
the sexual assault incident.  That bed sheet was
subsequently tested, DNA testing.

11

You're going to hear evidence that her blood group, her blood type was found on the bed sheet.

Det. Evans stated that a fitted bed sheet was seized from defendant's Linden home. He testified concerning two photographs, which showed discolorations or possible stains on the bed sheet. Det. Evans opined that the discolorations were "a discoloration similar to that of dried blood. That's what I thought it might have been." He also testified to blood and saliva samples obtained from N.R. by Dr. Shaw on April 30, 1997, which were transported by him to the prosecutor's officer laboratory. He further stated that blood and saliva samples that he observed being taken from defendant by a phlebotomist, pursuant to court order, were likewise transported by him to the laboratory for testing. Det. Evans further indicated that he took N.R.'s panties to the laboratory, so that any blood on the panties could be used to compare with the blood that was found on the bed sheet that was recovered from defendant's home.

In N.R.'s direct testimony, she testified that she was menstruating on the date that the alleged sexual assaults occurred. During direct examination, N.R. was shown two photographs and asked "What are they?" N.R. answered, "those are bed sheet and my blood on it."

During the State's case, the court was asked by defense counsel and the prosecutor to read a stipulation into the record. The following stipulation was read by the judge:

The State and defense have entered a stipulation in this trial. Again a stipulation is an agreement made by and between the, the State and the defense. You may consider the stipulation as evidence in this trial.

The State and defense agree that on April 24th, 1997 the white fitted bed sheet recovered from [L.W.'s] residence and the blood stained underwear worn by [N.R.] on April 13th, 1997, were transported to the Union County Prosecutor's Officer laboratory for analysis.

The State and defense also agree that on May 1st, 1997 blood and saliva samples taken from

[N.R.] were transported to the Union County
Prosecutor's laboratory for analysis.  And on July
3rd, 1997 blood and saliva samples were taken from
[L.W.].

The State and defense both agree that
analysis conducted on the white fitted bed sheet
seized from [L.W.'s] residence indicated that
semen and human blood were detected on the sheet.
Both the State and defense agree that no semen was
detected in the underwear.

The State and defense agree that analysis
conducted on the known blood and saliva samples
for [L.W.] and [N.R.] indicated that [N.R.] is an
A blood group while [L.W.] is a B blood group.
The analysis – analyses were conducted by Senior
Forensic Chemist Donna Hansen of the Union County
Prosecutor's Office laboratory. All evidence was
maintained at the Union County Prosecutor's Office
laboratory until it was transported to the New
Jersey State Police laboratory in West Trenton,
New Jersey for DNA analysis.

The State and defense agree that on March
6th, 1998 [N.R.'s] blood sample, [L.W.'s] blood
sample and the stained and unstained specimen cut
out of the bed sheet from [L.W.'s] residence were
transported from Union county Prosecutor's Office
laboratory to the New Jersey State Police
laboratory in West Trenton, New Jersey for DNA
analysis.  Detective Sandra Walker of the Union
County Prosecutor's Office Major Crime Unit
transported the specimens to the State Police
laboratory.  Those specimens were subsequently
analyzed by Principal Forensic Scientist Edward J.
LaRue of the New Jersey State Police laboratory.

The prosecutor argued in summation:

The bottom line is that [N.R.] was at that
house. [N.R.] was raped in that bed.  That blood
stain is [N.R.'s] ... [Detective Evans] goes to
the house on the 21st and he finds the blood
stained sheets, and he finds things that [N.R.]
told him would be there.

(Opinion of Appellate Division at 5-8, 13-16 (April 5, 2007).)
The Appellate Division found the claims regarding the blood and
DNA evidence sufficient to warrant an evidentiary hearing, and
remanded to the trial court for such a hearing.

Following an evidentiary hearing, the PCR court denied
relief.  On December 17, 2008, the Appellate Division affirmed.

We limit our discussion of the evidence and
arguments presented at trial to the facts that provide
the context essential for our discussion of defendant's
claim of ineffective counsel.  Defendant's challenge to
his trial attorney's performance is based on her
treatment of blood evidence relevant to his conviction
for aggravated sexual assault.  The victim testified
about acts of penetration that occurred in defendant's
bed on a day when she was menstruating.  After th crime
was reported, defendant's house was searched.  A
stained bed sheet was seized.  Controlled samples of
defendant's and the victim's blood and saliva were
taken, and DNA extracted from the stain on the bed
sheet was tested.  The results confirmed that the stain
contained defendant's DNA and the DNA of another
person.  The testing did not permit either the defense
expert or the State's expert to conclusively identify
or rule out the victim as the person who contributed
the unidentified DNA extracted from the stain.

At trial, defense counsel and the prosecutor
agreed to stipulate to the chain of custody for the bed
sheet and the controlled samples of blood and saliva
that were taken from defendant and the victim.  They
also stipulated that:  semen and blood were detected on
the bed sheet; no semen was detected in the victim's
underwear; and the defendant's blood type is "B" and
the victim's is "A.  The stipulation did not identify
the type of the blood found on the bed sheet, and no
evidence about the type of the blood that was found on
the sheet was introduced at trial.  Although the
scientific evidence of identity based on the stained
sheet was limited to the DNA evidence, the detective
who retrieved the sheet from defendant's bed testified
that the stain appeared to be dried blood, and the

14

victim was shown a photograph of the bed sheet, which she described as showing her blood on the sheet.

During opening argument, the prosecutor told the jurors that they would hear that the victim's "blood type was found on the bed sheet." In closing, the prosecutor argued, "[the victim] was raped in that bed. That blood stain is [hers.]"

On remand, Judge Anzaldi, who presided at defendant's trial, conducted an evidentiary hearing in accordance with this court's mandate. The attorney who represented defendant at trial, Cassandra Savoy, and the defense expert who addressed the State's DNA evidence, Dr. Robert Shaler, testified at that hearing.

At the evidentiary hearing, Savoy testified about her experience, trial preparation and her decisions to agree to the stipulated facts and refrain from objecting to the testimony and argument about the blood stain. Based on her prior experience representing defendants in trials involving DNA evidence, she did not view the critical question as whether there was blood on the sheet removed from defendant's bed or the type of the blood that was present. In her view, DNA evidence was superior because, unlike blood-type evidence that classifies people in a few large groups, DNA evidence can identify or exclude individuals. DNA evidence was also more important than blood-type evidence because the State was relying on DNA evidence.

Focusing on the DNA evidence, Savoy retained an expert who would call the value of the State's evidence into question. She retained Dr. Shaler, formerly a medical examiner with the Manhattan Coroner's Office, who had done "pioneering" work in the field of DNA evidence. In addition to corresponding with him in writing and by telephone, she spent four to five hours with Dr. Shaler in his home in preparation for trial.

Dr. Shaler testified about his efforts. He not only reviewed the State's results but also examined the underlying data at the State Police lab. He received all of the data he requested and needed to formulate his opinion, which was that the unidentified DNA extracted from the stain on the bed sheet could have been left by many persons in addition to the victim. In addition, he developed a basis for attacking the

15

validity of the identifying marker that prevented
exclusion of the victim as a possible donor of the
unidentified DNA.

In an effort to establish that the stipulation
about blood on defendant's bed sheet was improper,
defendant questioned Dr. Shaler about the absence of
evidence that the stain was a blood stain.  Dr. Shaler
explained that there was a lab report that showed the
bed sheet tested positive for human blood and semen.
He also noted that DNA of two persons would not have
been extracted from the stain if the stain were colored
by a substance other than human blood.

Defendant also questioned Dr. Shaler about the
absence of "blood type" evidence linking the victim to
the blood stain.  According to Dr. Shaler, the stain on
the sheet was not tested for blood type because it was
a "mixed stain."  For that reason, "blood typing" would
have been "problematic."  With "a mixture of ... bodily
fluids doing A/B/O typing is not as definitive as DNA
typing so it makes sense to continue on and not do the
A/B/O typing and do the DNA typing."  The test would be
positive for each blood type present.

Savoy explained that she stipulated to the blood
types of the victim and defendant and that blood was
found on the bed sheet because the State could not
conclusively establish that the victim was in
defendant's bed through blood-type evidence.  Moreover,
the facts she agreed to stipulate did not link the
victim's blood type to the stain on defendant's bed
sheet, and the State's physical evidence was based on
DNA retrieved from the sheet, not blood type.  Thus,
she did not view the stipulation as having evidential
value prejudicial to the defense, and she viewed the
stipulation as a way to avoid overwhelming the jurors
with scientific evidence by limiting the presentation
of this technical evidence.

Savoy also articulated her reasons for not
objecting to testimony about blood on the sheet offered
by the detective and the victim.  She did not object to
the detective's testimony because he likely could
provide a foundation for his lay opinion that the stain
on the bed sheet looked like dried blood.  While Savoy
could not recall hearing the victim's testimony
identifying the stain on the sheet as her own and did

not remember what she was thinking when the victim gave
that testimony, she noted that she could not prevent
the victim from telling her story, which was that she
was menstruating at the time of the sexual assault and
left blood on the sheet of defendant's bed.

Savoy also had grounds for declining to object to
portions of the prosecutor's opening and closing
statements referencing the blood stain.  She had two
reasons for allowing the prosecutor's opening statement
to pass without objection despite the reference to a
fact never established at trial - that the victim's
"blood type was found on the bed sheet."  Savoy
believed that she could argue the State's failure to
present such evidence in closing if necessary, and she
was not certain that the prosecutor would not attempt
to elicit that evidence from a DNA expert.  She did not
object when the prosecutor, in summation, urged the
jurors to find that the victim's blood was on
defendant's bed sheet because there was some support
for that argument in the State's DNA evidence.
Although that evidence was inclusive, it intended to
show that the victim was among the persons who could
have contributed to the stain.

In a written opinion dated September 28, 2007,
Judge Anzaldi, who presided over the trial and the
evidentiary hearing, found:

> 1.   As to the failure to ... object to the
> prosecutor's opening remarks, I find same without
> merit.  If the prosecutor was going to make an
> allegation at opening, then defense certainly had
> the right to wait and see where the evidence would
> take them and to challenge the [S]tate's failure
> to produce that which it said it could produce in
> opening.
>
> 2.   Failure to object to the detective's
> testimony referencing blood on the sheet.  I find
> this clearly is without merit, since both the
> defense expert and the [S]tate's expert agreed
> that there was, in fact, blood on the sheet.
>
> 3.   As to the victim's identifying the blood on
> the bed sheet as her blood, [defense counsel]
> acknowledged not recalling or hearing the
> testimony.  The failure to object does not cause

17

this court to find that counsel's performance was
deficient.  [The victim] testified that she was
familiar with the interior of the defendant's
home.  She testified that she was menstruating.
She testified that the blood that she saw in the
picture [of defendant's bed] was hers.

4.    Failure to object to the prosecutor's closing
remarks that the blood on the bed sheet was the
victim's.  I find that [defense counsel's] reasons
for not objecting to those remarks clearly fall
within trial tactics.  She believed this case
would be decided on DNA, not on blood type.  She
was also concerned that she did not wish to
alienate the jury by objecting to the prosecutor's
comments.  I find that the prosecutor's comments
were fair comment under the circumstances.  To
wit:  the victim placed herself in the home.  The
victim was bleeding.  Blood was found on the bed.
It was fair comment to suggest to the jury that it
was the victim's blood.

With respect to the stipulation, the judge determined:

As part of the trial strategy, Ms. Savoy agreed to
enter into the stipulation for a number of
reasons.  Specifically, she did not want to
overwhelm the jury with the science and secondly,
DNA was the crux of the case.  The stipulation was
primarily a chain of custody of the controlled
blood samples taken from [the victim] and the
defendant.  No blood typing was conducted as to
the sheet.  As to the sheet, both the [S]tate and
defense experts agreed that a mixed stain of semen
and human blood were detected on the sheet and
that the DNA was inconclusive.

Judge Anzaldi concluded:

Ms. Savoy's conduct met all professional standards
in defending a complex DNA trial.  She was
prepared.  She was ready.  She was experienced[,]
and she aggressively defended the defendant's
rights.  Neither prong of Strickland [v.
Washington, 466 U.S. 668, 694, 104 S.Ct. 2052,
2068, 80 L.Ed.2d 674, 698 (1984)] has been met.
Her representation did not fall below an objective
standard of reasonableness, nor fall outside the

> range of competence demanded of criminal defense
> attorneys.  The results ... would not have been
> different had she interposed the objections set
> forth above. ...  The defense aggressively argued
> to the jury the perceived deficiency of proofs in
> the [S]tate's case.
>
> ...
>
> After review of the record in light of the
> arguments presented ..., we conclude that the claims
> lack sufficient merit to comment beyond the observation
> that defendant's complaints about the manner in which
> the evidentiary hearing was conducted are wholly
> unsupported by the record.

(Opinion of Appellate Division at 2-11 (Dec. 17, 2008).)

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI. The right to counsel is "the right to <u>effective</u> assistance of counsel."  <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  <u>Strickland</u> at 694. Counsel's errors must have been "so serious as to deprive the

19

defendant of a fair trial, a trial whose result is reliable."
Id. at 687.  "When a defendant challenges a conviction, the
question is whether there is a reasonable probability that,
absent the errors, the factfinder would have had a reasonable
doubt respecting guilt."  Id. at 695.

The performance and prejudice prongs of Strickland may be
addressed in either order, and "[i]f it is easier to dispose of
an ineffectiveness claim on the ground of lack of sufficient
prejudice ... that course should be followed."  Id. at 697.

There is "a strong presumption that counsel's conduct falls
within the wide range of reasonable professional assistance."
Strickland, 466 U.S. at 689.  As a general matter, strategic
choices made by counsel after a thorough investigation of the
facts and law are "virtually unchallengeable," though strategic
choices "made after less than complete investigation are
reasonable precisely to the extent that reasonable professional
judgments support the limitations on investigation."  Id. at 690-
91.  If counsel has been deficient in any way, however, the
habeas court must determine whether the cumulative effect of
counsel's errors prejudiced the defendant within the meaning of
Strickland.  See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d
Cir. 1996).

Regarding the alleged "conflict of interest," Petitioner
contends that his counsel called defense expert Dr. Latimer to

20

testify regarding certain inconsistent statements by the victim
only after Petitioner brought the issue to the attention of the
trial court, and that defense counsel failed to call a government
rebuttal witness, Dr. Baker, to testify as to this same fact.
Though Petitioner characterizes this disagreement as a "conflict
of interest," the gist of his claim is that because of a
disagreement over this tactical issue, he was deprived of zealous
advocacy.

This issue was addressed, in a slightly different context,
on direct appeal.

> In order not to inconvenience her, the State's
> forensic expert, Dr. Christine Baker, a clinical
> psychologist, was asked to give rebuttal testimony
> outside the presence of the jury for potential use if
> the defense psychiatrist testified and rebuttal was
> warranted.  Dr. Baker testified outside the presence of
> the jury that N.R. told her she was assaulted both in
> Irvington and Linden on April 13, 1997, but was
> penetrated only once.
>
> As was apparently anticipated, when the defense
> expert, Dr. Richard Latimer, was called before the
> jury, he testified that N.R. told him, when asked
> "three times," that she was penetrated only once.
> However, Dr. Latimer further testified that N.R. told
> him that she was "confused" when she told him
> previously that she had been "raped" only once when
> asked about an assault in the office.  Dr. Baker was
> never recalled before the jury, and her "rebuttal"
> testimony was not read to the jury.
>
> Defendant now claims that the State suppressed the
> rebuttal testimony of Dr. Baker and that exculpatory
> evidence affecting N.R.'s credibility was kept from the
> jury.  He claims Dr. Baker's testimony about being told
> of only one penetration might have affected N.R.'s
> credibility in light of her testimony concerning
> multiple penetrations.  ...

21

After the testimony of Dr. Latimer was given, the State concluded that the rebuttal testimony of Dr. Baker, to whom N.R. indicated that she was assaulted at both locations, was not necessary.  While we do not endorse the concept of taking rebuttal testimony before a witness testifies, we do not see how the defendant could have been prejudiced by the procedure used or aided by the testimony.  Dr. Baker's additional testimony could have been helpful to the State, but was not introduced, and the jury was aware of N.R.'s allegedly inconsistent reports.  In her summation, defense counsel emphasized the impact of the Latimer testimony, including the fact that N.R. told him "on three separate occasions" that she was "sexually penetrated [only] once."  Moreover, defendant was found not guilty of the alleged sexual assault in Irvington on April 13, 1997, as well as two of the three sexual contact charges which allegedly occurred in Irvington. He was convicted only of sexual contact in Irvington on April 13, 1997, and aggravated sexual assault, occurring in Linden on the same day.

(Opinion of Appellate Division at 8-10 (Apr. 23, 2004).)

When Petitioner raised this issue again as an ineffective assistance claim in his state petition for post-conviction relief, the trial court denied relief, relying largely on the reasoning of the Appellate Division in the direct appeal, that the jury was made aware of the victim's inconsistent statements, both through witness testimony and counsel's arguments, and that the jury's verdicts suggest that they took that evidence into account.  (Tr. of Motion for Post-Conviction Relief at 71-73 (Decision) (June 17, 2005).)  On appeal, the Appellate Division found this claim insufficient to merit discussion.

Here, the state courts correctly identified and applied the governing standard under Strickland.  The state court decisions

22

were neither contrary to, nor involved an unreasonable
application of that standard, nor did the state court proceedings
result in a decision based on an unreasonable determination of
the facts in light of the evidence presented.  Petitioner is not
entitled to relief on this claim.

B.    Prosecutorial Misconduct Claim

Petitioner contends that the prosecutor violated
Petitioner's right to a fair trial when he made comments in his
opening remarks about the blood evidence, but failed to produce
that evidence at trial.  Petitioner also asserts that the
prosecutor used "invalid," "false," and "fabricated" DNA and
serologic forensic evidence.

The state courts rejected these claims.  On direct appeal,
and on the first appeal from the denial of post-conviction
relief, the Appellate Division did not consider that this claim
warranted discussion.  On the second appeal from denial of post-
conviction relief, the Appellate Division did address this claim.

> As noted above, this matter was before the trial
> court on remand from this court for the limited purpose
> of conducting an evidentiary hearing on specific claims
> of deficient performance by trial counsel.  Defendant
> did not file a new or amended petition for post-
> conviction relief, and his claims about the State's
> falsification and concealment were not raised below and
> need not be addressed here.  Because there is no
> support for either claim in this record, we consider
> and reject them.  Defendant's claim of concealment of
> evidence is based on nothing but supposition and
> suspicion, and his allegation of falsification of
> evidence is based solely on the prosecutor's opening
> argument, not on evidence introduced at trial.

23

> We agree that the prosecutor's opening argument
> was not proper because the State had no evidence to
> support the assertion about blood-type evidence.
> Nonetheless, when that assertion is viewed in the
> context of this case, which was focused on DNA evidence
> not blood-type evidence, the argument cannot be deemed
> capable of "substantially prejudic[ing] the defendant's
> fundamental right to have a jury fairly evaluate the
> merits. of his defense."  No reasonable juror could
> have been misled.

(Opinion of Appellate Division at 11, n.1 (Dec. 17, 2008)

(citations omitted).)

The U.S. Supreme Court has recognized the obligation of a

prosecutor to conduct a criminal prosecution with propriety and

fairness.

> He may prosecute with earnestness and vigor – indeed,
> he should do so.  But, while he may strike hard blows,
> he is not at liberty to strike foul ones.  It is as
> much his duty to refrain from improper methods
> calculated to produce a wrongful conviction as it is to
> use every legitimate means to bring about a just one.
> ...  Consequently, improper suggestions, insinuations,
> and, especially, assertions of personal knowledge are
> apt to carry much weight against the accused when they
> should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).  "The line

separating acceptable from improper advocacy is not easily drawn;

there is often a gray zone.  Prosecutors sometime breach their

duty to refrain from overzealous conduct by commenting on the

defendant's guilt and offering unsolicited personal views on the

evidence."  United States v. Young, 470 U.S. 1, 7 (1985).

> The prosecutor's vouching for the credibility of
> witnesses and expressing his personal opinion
> concerning the guilt of the accused pose two dangers:
> such comments can convey the impression that evidence

not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

Id. at 18.

Under U.S. Supreme Court precedent, where a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).   In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by or responsive to prior comments by opposing counsel. Darden, 477 U.S. at 181-82.   Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

In addition, the prosecution in a criminal matter has a constitutional obligation to disclose exculpatory evidence to the defendant.   See Brady v. Maryland, 373 U.S. 83 (1967), Giglio v. United States, 405 U.S. 150, 154 (1972) ("A finding of

materiality of the evidence is required under Brady.").
Exculpatory evidence is considered material "if there is a
reasonable probability that, had the evidence been disclosed to
the defense, the result of the proceeding would have been
different." Strickler v. Greene, 527 U.S. 263, 280 (1999)
(quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).
Nondisclosure merits relief only if the prosecution's failure
"'undermines confidence in the outcome of the trial.'" Kyles v.
Whitly, 514 U.S. 419, 434 (1995) (quoting Bagley, 473 U.S. at
678).

    This Court agrees with the state courts that nothing in the
prosecutor's remarks, taken in light of the trial and evidence as
a whole, deprived Petitioner of his right to a fair trial.  Nor
has Petitioner presented any evidence of concealment or
falsification of evidence.  Petitioner is not entitled to relief
on this claim.

C.   Motion for Appointment of Counsel

    Petitioner has asked this Court to appoint counsel for the
purpose of conducted discovery, investigation and witness
testimony, related to the DNA and blood evidence.

    There is no absolute constitutional right to appointed
counsel in a federal habeas corpus proceeding.  See Coleman v.
Thompson, 501 U.S. 722, 752 (1991); Reese v. Fulcomer, 946 F.2d
247, 263 (3d Cir. 1991), cert. denied, 503 U.S. 988 (1992),

superseded on other grounds by statute, 28 U.S.C. § 2254(d).

Pursuant to 18 U.S.C. § 3006A(a)(2)(B), however, this Court may

appoint counsel to represent an indigent habeas petitioner if it

determines "that the interests of justice so require."  See also

28 U.S.C. § 1915(e) (permitting appointment of counsel for

indigent civil litigants proceeding in forma pauperis).

> In exercising its discretion under §3006A,
>
>> the district court must first decide if the petitioner
>> has presented a nonfrivolous claim and if the
>> appointment of counsel will benefit the petitioner and
>> the court.  Factors influencing a court's decision
>> include the complexity of the factual and legal issues
>> in the case, as well as the pro se petitioner's ability
>> to investigate facts and present claims.  Courts have
>> held, for example, that there was no abuse of a
>> district court's discretion in failing to appoint
>> counsel when no evidentiary hearing was required and
>> the issues in the case had been narrowed, or the issues
>> were "straightforward and capable of resolution on the
>> record," or the petitioner had "a good understanding of
>> the issues and the ability to present forcefully and
>> coherently his contentions."

Reese, 946 F.2d at 263-4 (citations omitted).

> This standard is essentially the same as that applied under

28 U.S.C. § 1915(e).  See Parham v. Johnson, 126 F.3d 454, 456-57

(3d Cir. 1997).  In determining whether to appoint counsel to

civil litigants proceeding in forma pauperis, a court should

consider the following factors:

> As a preliminary matter, the plaintiff's claim must
> have some merit in fact and law. ... If the district
> court determines that the plaintiff's claim has some
> merit, then the district court should consider the
> following factors:

> (1) the plaintiff's ability to present his or her own case;
> (2) the complexity of the legal issues;
> (3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation;
> (4) the amount a case is likely to turn on credibility determinations;
> (5) whether the case will require the testimony of expert witnesses;
> (6) whether the plaintiff can attain and afford counsel on his own behalf.
> [Tabron v. Grace, 6 F.3d 147, 155-56, 157 n.5 (3d Cir. 1993), cert. denied, 510 U.S. 1196 (1994).] This list of factors is not exhaustive, but instead should serve as a guide post for the district courts.
> Correspondingly, courts should exercise care in appointing counsel because volunteer lawyer time is a precious commodity and should not be wasted on frivolous cases. Id. at 157.

Parham, 126 F.3d at 457-58.

Analysis of these factors reveals that appointment of counsel is not appropriate in this matter. As a preliminary matter, Petitioner's application for a writ of habeas corpus is sufficient to avoid dismissal on its face.

However, the state court record was sufficient for determination of this matter. Petitioner has not established any entitlement to present new evidence in this matter.

Prior to enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. 104-132, 110 Stat. 1217 (April 24, 1996), the Supreme Court held that "where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew."

28

Townsend v. Sain, 372 U.S. 293, 312 (1963).  Indeed, in certain
circumstances, an evidentiary hearing was mandatory.

> Where the facts are in dispute, the federal court in
> habeas corpus must hold an evidentiary hearing if the
> habeas applicant did not receive a full and fair
> evidentiary hearing in a state court, either at the
> time of the trial or in a collateral proceeding.  In
> other words a federal evidentiary hearing is required
> unless the state-court trier of fact has after a full
> hearing reliably found the relevant facts.
>
> ...
>
> [A] federal court must grant an evidentiary hearing to
> a habeas applicant under the following circumstances:
> If (1) the merits of the factual dispute were not
> resolved in the state hearing; (2) the state factual
> determination is not fairly supported by the record as
> a whole; (3) the fact-finding procedure employed by the
> state court was not adequate to afford a full and fair
> hearing; (4) there is a substantial allegation of newly
> discovered evidence; (5) the material facts were not
> adequately developed at the state-court hearing; or (6)
> for any reason it appears that the state trier of fact
> did not afford the habeas applicant a full and fair
> fact hearing.

Id. at 312-13.  The Supreme Court later refined this standard
with respect to the fifth circumstance enumerated in Townsend,
requiring a prisoner to "show cause for his failure to develop
the facts in the state-court proceedings and actual prejudice
resulting from that failure," but not otherwise curtailing the
Townsend list.  Keeney v. Tamayo-Reyes, 504 U.S. 1, 11 (1992).
Keeney's threshold standard of diligence was codified by AEDPA in
the opening clause of new 28 U.S.C. § 2254(e)(2).  Williams v.
Taylor, 529 U.S. 420 (2000).

Title 28 Section 2254(e) curtails the circumstances under which a District Court may grant an evidentiary hearing. It provides:

> (e)(1)  In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.
>
> (2)  If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A)  the claim relies on—
> (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable; or
> (ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e).

Thus, if a prisoner fails to develop the factual basis of a claim in State court proceedings, through some lack of diligence or greater fault attributable to the prisoner or the prisoner's counsel, an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of § 2254(e)(2). Williams, 529 U.S. at 429-37. Conversely, where the facts have not been developed in State court proceedings through no fault of

30

the prisoner or the prisoner's counsel, the prisoner is "excused from showing compliance with the balance of the subsection's requirements." Id. at 437.

> However, even if a new evidentiary hearing is permitted under AEDPA--when it is solely the state's fault that the habeas factual record is incomplete--AEDPA, unlike Townsend and Keeney, does not require that such a hearing be held. Instead, federal courts have discretion to grant a hearing or not. In exercising that discretion, courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim.

Campbell v. Vaughn, 209 F.3d 280, 287 (3d Cir. 2000).

Finally, § 2254(e)(2)'s introductory language "does not preclude federal hearings on excuses for procedural default at the state level." Cristin v. Brennan, 281 F.3d 404, 413 (3d Cir. 2002).

Here, Petitioner failed to develop the facts he alleges regarding the DNA and blood evidence at the state court level. He has failed to establish that the factual predicates for his claims could not have been developed in state court through the exercise of due diligence. Accordingly, he is not entitled to present new evidence here, and there is no basis for the appointment of counsel.

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, jurists of reason could not disagree with this Court's resolution of Petitioner's claims.  No certificate of appealability shall issue.

V.   CONCLUSION

For the reasons set forth above, the Petition will be denied.  An appropriate order follows.

Stanley R. Chesler
United States District Judge

Dated: 9/23/10